## CUMMINGS *v.* CHICAGO.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 136. Submitted December 19, 1902.—Decided February 23, 1903.

1. The plaintiffs by their complaint asserted a right, under the Constitution of the United States and certain acts of Congress and a permit of the Secretary of War, issued in conformity with those acts, to construct a dock in the Calumet River, a navigable water of the United States within the limits of the city of Chicago. The bill showed that this

right was denied by the city of Chicago, upon the ground that the plaintiffs had not complied with its ordinances requiring a permit from its Department of Public Works before any such structure could be erected within the limits of that city. *Held:*

(1) That the suit was one arising under the Constitution and laws of the United States, and was therefore one of which, under the act of August 13, 1888, c. 866, the Circuit Court of the United States could take jurisdiction, without reference to the citizenship of the parties.

(2) As such a suit involved the construction and application of the Constitution of the United States, the appeal from the final judgment of the Circuit Court in such an action could be taken directly to the Supreme Court of the United States under the act of March 3, 1891, c. 517.

2. Neither the act of Congress of March 3, 1899, c. 425, nor any previous act relating to the erection of structures in the navigable waters of the United States manifested any purpose on the part of Congress to assert the power to invest private persons with power to erect such structures within a navigable water of the United States, wholly within the territorial limits of a State, without regard to the wishes of the State upon the subject.

3. Under existing legislation, the right to erect a structure in a navigable water of the United States, wholly within the limits of a State, depends upon the concurrent or joint assent of the state and National Governments.

THE appellants, citizens of Illinois, brought this suit against the city of Chicago for the purpose of obtaining a decree restraining the defendant, its officers and agents, from interfering with the construction of a dock in front of certain lands owned by the plaintiffs and situated on Calumet River, within the limits of that city.

The city demurred to the bill upon the ground that it did not state facts entitling the plaintiffs to the relief asked. The demurrer was sustained and the bill was dismissed for want of equity.

The controlling question in the case is whether the plaintiffs have the right, in virtue of certain legislation of Congress and of certain action of the Secretary of War, to which reference will be presently made, to proceed with the proposed work in disregard of an ordinance of the city of Chicago requiring the permission of its Department of Public Works as a condition precedent to the construction of any dock within the limits of

the city.   The plaintiffs had not obtained any permit from that Department.

The legislation of Congress and the action of the Secretary of War upon which the plaintiffs rely are very fully set forth in the bill and are as follows :

In the River and Harbor Appropriation Act of August 2, 1882, c. 375, will be found this provision : " Improving harbor at Calumet, Illinois : Continuing improvement, thirty-five thousand dollars: *Provided,* That with a view to the improvement of the Calumet River, in the State of Illinois, from its mouth to the Fork at Calumet Lake, the Secretary of War shall appoint a board of engineers who shall examine said river and report upon the practicability and the best method of perfecting and maintaining a channel for through navigation to said Fork at Lake Calumet, adapted to the passage of the largest vessels navigating the Northern and Northwestern Lakes, limiting and locating the lines of channel to be improved by the United States, and of docks that may be constructed by private individuals, corporations, or other parties, and clearly defining the same under the direction of the Chief of Engineers, United States Army ; and the Secretary of War shall report to Congress the result of said examination, and the estimated cost of the proposed improvement; also what legislation, if any, is necessary, to prevent encroachments being made or maintained within the limits of the channel designated as above provided for."   22 Stat. 194.

Thereafter, the bill alleges, the Secretary of War appointed a board of engineers, who surveyed the river and defined the lines of its channel and of docks to be constructed, under the direction of said Chief of Engineers ; and the Secretary of War thereafter reported to Congress the estimated cost of the proposed improvement.

In the River and Harbor Appropriation Act of July 5, 1884, c. 229, this provision was inserted : " Improving Calumet River, Illinois : Continuing improvement, fifty thousand dollars : *Provided, however,* That no part of said sum shall be expended until the right of way shall have been conveyed to the United States, free from expense, and the United States shall be fully

released from all liability for damages to adjacent property-owners, to the satisfaction of the Secretary of War." 23 Stat. 133, 143.

Under these enactments, the bill alleged, the United States caused a plat to be made establishing the channel of the river and its lines, and fixing the dock lines thereof: That plat was approved by the Chief of Engineers of the Army and was duly recorded in the recorder's office of Cook County.

The above legislation was followed by this provision in the River and Harbor Act of August 5, 1886, c. 929 : " Improving Calumet River, Illinois : Continuing improvement, thirty thousand dollars ; of which eleven thousand two hundred and fifty dollars are to be used' between the Forks and one half mile east of Hammond, Indiana, . . . *Provided, however*, That no part of said sum, nor any sum heretofore appropriated, except the said eleven thousand two hundred and fifty dollars, for the river above the Forks, shall be expended until the entire right of way, as set forth in Senate Executive Document Number Nine, second session Forty-seventh Congress, shall have been conveyed to the United States free of expense, and the United States shall be fully released from all liability for damages to adjacent property-owners, to the satisfaction of the Secretary of War ; . . ." 24 Stat. 310, 325.

Without going into all the details set forth in the bill, it may be assumed that the deeds of conveyance which the above acts of 1884 and 1886 required to be made to the United States were in fact made and accepted.

The bill alleges that the United States by its duly authorized officials thereafter entered upon the improvement of Calumet River in accordance with the surveys and plans adopted by the Chief of Engineers of the United States Army and " thereby established said dock or channel line on the west line of said river in the manner and form shown by said plat approved by the said Chief of Engineers and filed for record as aforesaid."

By the seventh section of the River and Harbor Act of Congress, approved September 19, 1890, c. 907, it was provided : " That it shall not be lawful to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty, or structure of

any kind outside established harbor-lines, or in any navigable waters of the United States where no harbor-lines are or may be established, without the permission of the Secretary of War, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce, or anchorage of said waters, and it shall not be lawful hereafter to commence the construction of any bridge, bridge-draw, bridge piers, and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river, or navigable waters of the United States, under any act of the legislative assembly of any State, until the location and plan of such bridge or other works have been submitted to and approved by the Secretary of War, or to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of the channel of said navigable water of the United States, unless approved and authorized by the Secretary of War : *Provided*, That this section shall not apply to any bridge, bridge-draw, bridge piers and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, drawbridge, bridge piers and abutments, or other works, under an act of the legislature of any State, over or in any stream, port, roadstead, haven or harbor, or other navigable water not wholly within the limits of such State." 26 Stat. 426, 454.

Then, by the tenth section of the River and Harbor Act of March 3, 1899, c. 425, it was provided : " That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited ; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War ; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, con-

dition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same." 30 Stat. 1121, 1151.

Subsequently, the plaintiffs and the Calumet Grain and Elevator Company—the latter also owning land on the Calumet River in front of which the proposed new dock would be built —caused plans of the dock to be prepared and submitted to the Secretary of War and the Chief of Engineers of the Army, and application was made to the former for permission to rebuild the dock along the front of their lands on Calumet River as shown by those plans.

Those plans were approved by the United States Engineer stationed at Chicago, and were subsequently recommended by the Chief of Engineers of the Army. The Secretary thereupon issued and delivered to the plaintiffs and the Grain and Elevator Company the following instrument:

"Whereas, by section 10 of an act of Congress, approved March 3, 1899, entitled ' An act making appropriations for the construction, repair and preservation of certain public works on rivers and harbors, and for other purposes,' it is provided that it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same; and whereas, D. M. Cummings, as executor of the estate of C. R.

Cummings, and the Calumet Grain and Elevator Company have applied to the Secretary of War for permission to rebuild the dock in front of that part of block 108, in sections 5 and 6, T. 37, R. 15, E., fronting on Calumet River, south of 95th street, Chicago, Illinois, along the lines shown on the attached plans, which have been recommended by the Chief of Engineers; now therefore this is to certify that the Secretary of War hereby gives unto said D. M. Cummings, as executor of the estate of C. R. Cummings, and the Calumet Grain and Elevator Company permission to rebuild the dock, at said place, along the lines shown on said plans, subject to the following condition : That the work herein permitted to be done shall be subject to the supervision and approval of the engineer officer of the United States Army in charge of the locality. Witness my hand this 12th day of May, 1900. Elihu Root, *Secretary of War.*"

The bill then alleged—

That after the granting of permission by the Secretary of War, the plaintiffs became entitled, in virtue of that permission and the provisions of the act of March 3, 1899, to build the proposed dock in front of their premises, subject only to the condition that the work should be under the supervision and be approved by the engineer officer of the Army in charge of the locality ;

That after the action of the Secretary of War they entered into a contract for the building of the dock and were engaged in the prosecution of the work when, about the 15th of October, 1900, the city of Chicago, by its officers and agents, put a stop to the work by force and threats, asserting that it could not be prosecuted unless a permit therefor be issued by its Department of Public Works ;

That this action of the city was taken pursuant to certain ordinances theretofore passed by the city council and which made it the duty of the city's Harbor Master to require all parties engaged in repairing, renewing, altering, or constructing any dock within the city to produce such permit and in default thereof to cause the arrest of any parties engaged in the work and the removal of the dock ;

That the engineer officer in the Department of Public Works of the city, having agreed that the city had no power to interfere with the plaintiffs or prevent the building of said dock by them, agreed that the work should not be interfered with by the city or its agents;

That the plaintiffs thereupon resumed the construction of the dock, but they were again stopped by the city through its police, and plaintiffs' contractors, agents and servants were forced to discontinue the work, being threatened with arrest and violence if they should attempt to continue it further;

That the city by its officers and agents has notified the plaintiffs that they will not be permitted to continue the work or to build the dock in front of their premises, notwithstanding the permission or authority given to them by the Secretary of War, and that, by its police, it would forcibly prevent the building thereof, arrest those engaged in doing the work, and remove any dock built; and,

That the city wholly refuses to recognize the permission and authority given the plaintiffs by the Secretary of War to build said dock, and their right "under the Constitution and laws of the United States, and more particularly under the said act of Congress of March 3, 1889, to build it by virtue of the said authority and permission granted by the Secretary of War and the approval and recommendation of the plans therefor by the Chief of Engineers of the United States Army;"

That in view of the action taken by the city and its police, they fear that attempts to continue their work will necessarily be futile and lead to breaches of the peace and conflicts between the men engaged in the work and the police of the city of Chicago; and that the right to build said dock in front of their premises in accordance with the permission and authority given them by the Secretary of War and on the lines recommended by the Chief of Engineers and within the dock line established by said survey and by the deed to the United States is a property right, which the plaintiffs have as the owners of the premises and of the land upon which the dock is to be built, and that the action of the city in thus preventing the building of the dock is a taking of the property of the plaintiffs " without due

process of law, and a taking thereof for public use without just compensation, in violation of the Fifth Amendment of the Constitution of the United States."

The relief asked was a decree enjoining the city, its agents and officers, from interfering with the building of the dock, and that upon the final hearing of the cause, it be adjudged and decreed that under the acts of Congress the plaintiffs have the right by virtue of the permission granted by the Secretary of War to build the dock on the lines shown by the plans recommended by the Chief of Engineers, and that the city of Chicago has no right, power or authority to interfere therewith.

*Mr. S. A. Lynde* and *Mr. Warren B. Wilson* for appellants.

I. The United States, in its survey and plat of the channel of this river and in its improvement of the river under the acts of Congress of August 2, 1882, and July 5, 1884, has fixed and established the lines of the channel of the river and of the docks that might be constructed thereon.

II. By the terms and provisions of the deeds which Congress required to be made to the United States by the owners of the land fronting on this river, as a condition for the expenditure of the moneys appropriated for the improvement of the river, the shore and dock lines as established and fixed by the government survey, are to be taken for all purposes as the true meander lines of this stream; and, under the deed which was made to the United States pursuant to this provision of the act of Congress, aforesaid, by Columbus R. Cummings, and under the acts of Congress of August 2, 1882, and of July 5, 1884, referring to the improvement of this river, the appellants are entitled as the owners of these premises to build their proposed dock on the line shown by the plan attached to the permit that issued to them by the Secretary of War, which is within the line which has been established by the United States as the dock line of these premises and which has been fixed and made the meander line of this stream.

As riparian owners the appellants had the right to build their dock, subject only to the public easement for the purpose of navigation. *Yates* v. *Milwaukee*, 10 Wall. 497; *Chicago*

v. *Laflin,* 49 Illinois, 172; *Chicago* v. *McGinn,* 51 Illinois, 266; *Chicago* v. *Van Ingen,* 152 Illinois, 624.

III. Congress has taken jurisdiction over this river as one of the navigable waters of the United States; and has improved it and made it navigable and available for commerce, and has directed and caused the channel and dock lines of the river to be defined and established. Its jurisdiction over this river for the purpose of navigation and the protection thereof, and its power to control the building of docks or other structures in this river is, when exercised, supreme; and neither the State of Illinois nor the city of Chicago, its agent, has any power to interfere with or prevent the erection of any dock or structure which Congress has authorized to be built in this river. *Gibbons* v. *Ogden,* 9 Wheat, 1; *Pennsylvania* v. *Wheeling etc. Bridge Co.,* 13 Howard, 518, 566; *S. C.,* 18 Howard, 421, 460; *Gilman* v. *Philadelphia,* 3 Wall. 713, 724; *Pound* v. *Turck,* 95 U. S. 459; *Wisconsin* v. *Duluth,* 96 U. S. 379, 387; *Bridge Co.* v. *United States,* 105 U. S. 470, 475, 479; *Cardwell* v. *American Bridge Co.,* 113 U. S. 1; *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1.

As to power of Congress to determine what shall or shall not be deemed in law an obstruction to navigation, *Pennsylvania* v. *Wheeling etc. Bridge Co.,* 18 Howard, 421, 460; *In re Clinton Bridge,* 10 Wall. 454; *South Carolina* v. *Georgia,* 93 U. S. 4; *North Bloomfield Gravel Mining Co.* v. *United States,* 88 Fed. Rep. 675.

A State has no power to interfere with erection of any structure in navigable waters authorized by Congress. *Decker* v. *B. & N. Y. R. Co.,* 30 Fed. Rep. 723; *Stockton* v. *B. & N. Y. R. Co.,* 32 Fed. Rep. 9; *Penn. R. Co.* v. *N. Y. R. Co.,* 37 Fed. Rep. 129.

On question as to police power of State, in addition to authorities above cited, see also *County of Mobile* v. *Kimball,* 102 U. S. 691, 699; *Escanaba Co.* v. *Chicago,* 107 U. S. 678, 683; *Sands* v. *Manistee River Imp. Co.,* 123 U. S. 288.

IV. Under the provisions of section 10 of the act of March 3, 1899, the Secretary of War was empowered by Congress to approve and permit the erection of docks in navigable rivers of

the United States on plans recommended by the Chief of En-
gineers; and the permit which was issued to the appellants by
the Secretary of War to rebuild their dock in front of these
premises on the plan attached thereto, which was approved
by the Chief of Engineers gave them full right and authority
under said act of Congress to build said dock in accordance
with said permit, and the city of Chicago had no power or
authority to interfere with or prevent them from building this
dock, and could not lawfully stop its construction.

The appellants base their claim of right to build this dock
without interference from the city of Chicago on two grounds:

1. On the acts of August 2, 1882, and July 5, 1884, and the
provision of the deed from Cummings to the United States, that
this line, which has been established by the United States, shall
be taken as the " true meandered " line of this stream.

2. On the act of March 3, 1899, and the permit, which the
Secretary of War has issued to them thereunder.

This authority from the Secretary of War is given by and
under the act of March 3, 1899, and is paramount, and excludes
any state or municipal control of this same matter. *South
Carolina* v. *Georgia,* 93 U. S. 4; *Wisconsin* v. *Duluth,* 96 U. S.
379; *United States* v. *Milwaukee & St. Paul Ry. Co.,* 5 Bissell,
410; Federal Cases No. 15,778; *United States* v. *Milwaukee &
St. Paul Ry. Co.,* 5 Bissell, 410; Federal Cases, No. 15,779;
*Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1; *United States* v.
*Bellingham Bay Boom Co.,* 176 U. S. 211, 217; *United States*
v. *Ormsby,* 74 Fed. Rep. 207; *United States* v. *City of Moline,*
82 Fed. Rep. 592.

The delegation of power to the Secretary of War by the act
of 1899 to issue this permit is valid.

In addition to authorities last above cited, see *Luther* v.
*Borden,* 7 How. 1; *Miller* v. *Mayor of New York,* 109 U. S.
385; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Field* v. *Clark,* 143 U. S.
649; *L. S. & M. S. Ry. Co.* v. *State of Ohio,* 165 U. S. 365.

V. The right to build this structure upon their premises
within the dock line established by the United States and under
the permit issued to them under the said act of Congress is a
property right vested in the appellants which is conceded to be

of greater value than $2000, and the action of the city of Chicago in preventing the building of said dock by the appellants is a taking of their property without due process of law and a taking thereof for public use without just compensation in violation of the provisions of the Constitution of the United States.

*Mr. Charles M. Walker* and *Mr. Henry Schofield* for appellees.

I. The Circuit Court, as a Federal court, had no jurisdiction.

If the statement of the claim, or demand, in each bill does not, in and of itself, show, that the claim, or demand, arises under the Constitution, or laws, of the United States, the fact that the defendant filed a demurrer cannot aid the statement to that end. *Tennessee* v. *Union & Planters' Bank,* 152 U. S. 454; *Houston & Texas Central Rd. Co.* v. *Texas,* 177 U. S. 66, 78, and cases cited; *New Orleans* v. *Benjamin,* 153 U. S. 411, 424, 431.

The jurisdiction cannot rest on section 629, subdivision " sixteenth," of the Revised Statutes, because said section, if in force, has no application.

II. Even if the Circuit Court, as a Federal court, did have jurisdiction in these cases, this court has no jurisdiction, because section 6 of the Court of Appeals Act vests the appellate jurisdiction in these cases in the Court of Appeals exclusively.

The jurisdiction of the Circuit Court could not rest on the ground that the suits arise under the Constitution of the United States, because the attempt to draw in question the validity of an ordinance of the city of Chicago is wholly abortive, neither the ordinance itself being set forth, nor any statute of the State authorizing the passage of the ordinance being set forth, in any way whatever. The State of Illinois cannot be convicted of violating the Fourteenth Amendment without allegation, or proof, approximating, at least, to a certainty. No reason is perceived why the rule stated in *Yazoo & Mississippi Railroad Co.* v. *Adams,* 180 U. S. 41, 48, on error to a state court, is not applicable. A municipal ordinance is not a state act, unless passed under legislative authority. *Hamilton Gas Light*

*Co.* v. *Hamilton City,* 146 U. S. 258, 265–266. This court has no jurisdiction under section 5 of the Court of Appeals Act. Curtis' Jurisdiction of U. S. Courts, 2d ed. pp. 67–73.

The cases are " cases other than those provided for " in section 5 of the Court of Appeals Act; and the act of March 3, 1899, under sections 10 and 12 of which these cases arise, being a criminal law, section 6 of the Court of Appeals Act makes the judgment of the Court of Appeals final.

II. The court below, as a court of equity, had no jurisdiction because the remedy at law is entirely adequate. That is, the bills do not show that it is not. And also a court of equity will not generally stop the enforcement of a penal police ordinance. *People* v. *Canal Board of New York,* 55 N. Y. 390; *Davis* v. *American Society for Preventing Cruelty to Animals,* 75 N. Y. 362; *Poyer* v. *Village of Des Plaines,* 123 Illinois, 111; 1 Foster's Fed. Practice, 2d ed. sec. 215; *In re Sawyer,* 124 U. S. 200; *Harkrader* v. *Wadley,* 172 U. S. 166; *Fitts* v. *McGhee,* 172 U. S. 531; *Osborne* v. *Missouri Pacific. Ry. Co.,* 147 U. S. 248, 258.

IV. Complainants should have joined in one bill, as, at best, they held a joint permit under section 10 of the act of March 3, 1899. *Minnesota* v. *Northern Securities Co.,* 184 U. S. 199, 234, 238. One is not a party, though named in the pleadings, unless he is brought in by process, or appears. *Terry* v. *Com. Bank,* 92 U. S. 454; *May* v. *Le Claire,* 11 Wall. 217.

V. Complainants do not own the land they intend to build on. It is conceded that it is established law in the State of Illinois, that a conveyance of land *calling for running water as a boundary* carries title to submerged land to the middle of such running water, whether the water be navigable or not. Notwithstanding the decision of the majority of the judges in *Hardin* v. *Jordan,* 140 U. S. 371 (1890), the rule is different where the conveyance calls for *still* water, ponds or lakes, navigable or not, for a boundary. *Fuller* v. *Shedd.* 161 Illinois, 462 (1896). The descriptions in the bill call for a fixed boundary or for a definite extent of land. In *McCormick* v. *Huse,* 78 Illinois, 363, the extent of land, or quantity of land, conveyed controlled. In *Brophy* v. *Richeson,* 137 Indiana, 114, meander

lines and stakes controlled. *Rockwell* v. *Baldwin,* 53 Illinois, 19. In *Handly's Lessees* v. *Anthony,* 5 Wheaton, 374, the words "northwest of the River Ohio," in the Virginia grant of the Northwest Territory, was held to restrict the boundary to the low water mark on the northwest bank of the Ohio River. A plat referred to in a description is part of the description. *Henderson* v. *Hatterman,* 146 Illinois, 555 ; *Smith* v. *Young,* 160 Illinois, 163, 170. . Appellants are asking a court of equity to aid them to commit trespasses. *Braxon* v. *Bressler,* 64 Illinois, 488, a case of taking rocks from bed of a stream, held to be trespass. *Washington Ice Co.* v. *Shortall,* 101 Illinois, 46, taking ice found on stream held to be trespass. *Shively* v. *Bowlby,* 152 U. S. 138.

VI. There is no collision between section 10 of the act of March 3, 1899, and the ordinance of the city of Chicago.

In the absence of any national or state statute, or municipal ordinance regulating the subject, the ownership of the submerged soil, by the law of Illinois, gives only a *license* to such owner to build a *wharf* on such soil. When a State parts with its title to the bed of navigable water, and thereby gives, as in Illinois, an implied license to build wharves in the bed in aid of commerce, it nevertheless retains its power to control and prohibit, in the interest of the public, the building of wharves and other structures in such bed, and does not, and cannot thereby, in any way, impair, or diminish, the power of Congress, under the commerce clause, to regulate and prohibit, in the interest of interstate and foreign commerce, the use of such bed, or the police power of the State. *Prosser* v. *Northern Pacific R. R. Co.,* 152 U. S. 59, 64–65 ; *Shively* v. *Bowlby,* 152 U. S. 1, 40, VII ; *Walker* v. *Marks,* 17 Wall. 648 ; *Weber* v. *State Harbor Comrs.* 18 Wall. 57 ; *Com.* v. *Alger,* 7 Cush. 53 ; *People* v. *New York & Staten Island Ferry Co.,* 68 N. Y. 71 ; *State* v. *Sargent,* 45 Connecticut, 358 ; *Hawkins Point Light House,* 39 Fed. Rep. 77, brief for the Government ; Gould, Waters, 3d ed. sec. 138 and sec. 179, at p. 349, and cases cited.

In the case of *navigable streams,* the cases in Illinois all recognize, that the *license* of a riparian owner on a navigable stream in Illinois, by virtue of his ownership of the bed in front of his

land, may be regulated and prohibited by the legislature in the interest of the public easements of navigation, etc. *Middleton* v. *Pritchard*, 3 Scam. 510 (1842); *People* v. *St. Louis*, 5 Gilman, 351 (1848); *Canal Trustees* v. *Havan*, 5 Gilman, 548 (1849); *Illinois River Packet Co.* v. *Peoria Bridge Co.*, 38 Illinois, 417 (1865); *Ensminger* v. *People*, 47 Illinois, 384 (1868); *City of Chicago* v. *Laflin*, 49 Illinois, 172 (1868); *City of Chicago* v. *McGinn*, 51 Illinois, 766 (1869); *Rockwell* v. *Baldwin*, 53 Illinois, 19 (1869); *Hubbard* v. *Bell*, 54 Illinois, 110 (1870); *Braxon* v. *Bressler*, 64 Illinois, 488 (1872); *Washington Ice Co.* v. *Shortall*, 101 Illinois, 46 (1881); *Piper* v. *Connolly*, 108 Illinois, 646 (1884).

There can be no doubt that Congress has power to *prevent* the erection of any kind of structures, constituting obstructions to navigation, over, or in, the Calumet River, the same being navigable waters of the United States, even when such structures are authorized by state law.

It is very apparent that the River and Harbor Act of 1899 is preventive legislation, and is not legislation designed to grant authority. The power of the Secretary of War is to prevent the erection of structures, bridges, on, over, and in, navigable waters of the United States, if they will be obstructions, and not to authorize them. The act is preventive and defensive, and it has been so authoritatively decided in regard to the River and Harbor Act of 1890, almost the first of the acts containing these preventive, defensive regulations. *Lake Shore & Michigan Southern R. Co.* v. *Ohio*, 165 U. S. 365. See *Lane* v. *Smith*, 71 Connecticut, 65, 70.

The language of the act of Congress of 1899 is prohibitory, preventive and defensive, and is not apt language to affirmatively give authority. See sections 9 and 10 of act.

There is no material difference between the act of 1890, involved in 165 U. S. 365, and the act of 1899, involved in the case at bar. The construction of the act of 1890, sanctioned by the Supreme Court, had previously been given by Mr. Attorney General Miller. 20 Ops. Atty. Genl. 102, 114.

If the power of the Secretary of War is exclusive of any action by the State, then the United States should bear all the

expense of managing and controlling the Calumet River, and the city of Chicago should abolish its Harbor Department, and use the money spent in maintaining it for some other purpose.

Numerous decisions of the Supreme Court, from *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), (for a leading case, see *Cooley* v. *The Board of Wardens of the Port of Philadelphia*, 12 How. 299, 1851), conceded to the states power over local matters such as bridges, quarantine, pilots, wharves, etc., in the absence of any legislation on the same subject by Congress, although the exercise of such power by the States might, and often did, incidentally affect, impede and embarrass interstate commerce. The policy of the recent River and Harbor Acts is not to abrogate this state power entirely, but to control its exercise in defence of interstate and foreign commerce. *Sinnot* v. *Davenport*, 22 How. 227; *Ex parte Siebold*, 100 U. S. 371.

We believe that the construction which counsel seek to put upon the power vested in the Secretary of War by the act of Congress of 1899, makes the constitutionality of that act, as applied to the facts in this case, very doubtful. Where does Congress get the power to authorize the Secretary of War to give a private person leave to put a structure of no aid at all, or, at best, of only doubtful and purely private aid, to interstate commerce, in a local harbor, and thus displace the police power of the States, expressly reserved to them and to the people. Constitution, Art. X; Art. X. of Amendments; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

At any rate, that the ordinances of the city and the act of Congress are not irreconcilably in conflict would seem to be clear.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

1. We hold that the Circuit Court had jurisdiction in this case. That the parties, plaintiffs and defendant, are citizens of the same State is not sufficient to defeat the jurisdiction; for by the act of March 3, 1887, c. 373, as corrected by the act of

August 13, 1888, c. 866, the Circuit Courts have jurisdiction, without reference to the citizenship of the parties, of suits at common law or in equity arising under the Constitution or laws of the United States. 24 Stat. 552; 25 Stat. 434. The present suit does arise under the Constitution and laws of the United States, because the plaintiffs base their right to construct the dock in question upon the Constitution of the United States, as well as upon certain acts of Congress and the permit (so-called) of the Secretary of War—which legislative enactments and action of the Secretary of War were, it is alleged, in execution of the power of Congress under the Constitution over the navigable waters of the United States. Clearly, such a suit is one arising under the Constitution and laws of the United States. That it is a suit of that character appears from the bill itself. The allegations which set forth a Federal right were necessary in order to set forth the plaintiffs' cause of action.

2. The appeal was properly taken directly to this court, since by the act of March 3, 1891, c. 517, this court has jurisdiction to review the judgment of the Circuit Court in any case involving the construction or application of the Constitution of the United States. 26 Stat. 834. The present case belongs to that class; for, it involves the consideration of questions relating to the power of Congress, under the Constitution, over the navigable waters of the United States.

3. We come now to the merits of the suit as disclosed by the bill. The general proposition upon which the plaintiffs base their right to relief is that the United States, by the acts of Congress referred to and by what has been done under those acts, has taken "possession" of Calumet River, and so far as the erection in that river of structures such as bridges, docks, piers and the like is concerned, no jurisdiction or authority whatever remains with the local authorities. In a sense, but only in a limited sense, the United States has taken possession of Calumet River, by improving it, by causing it to be surveyed, and by establishing lines beyond which no dock or other structure shall be erected in the river without the approval or consent of the Secretary of War, to whom has been

committed the determination of such questions.   But Congress has not passed any act under which parties, having simply the consent of the Secretary, may erect structures in Calumet River without reference to the wishes of the State of Illinois on the subject.   We say the State of Illinois, because it must be assumed, under the allegations of the bill, that the ordinances of the city of Chicago making the approval of its Department of Public Works a condition precedent to the right of any one to erect structures in navigable waters within its limits, are consistent with the constitution and laws of that State and were passed under authority conferred on the city by the State.

Calumet River, it must be remembered, is entirely within the limits of Illinois, and the authority of the State over it is plenary, subject only to such action as Congress may take in execution of its power under the Constitution to regulate commerce among the several States.   That authority has been exercised by the State ever since it was admitted into the Union upon an equal footing with the original States.

In *Escanaba Company* v. *Chicago*, 107 U. S. 678, 683, the question was as to the validity of regulations made by the city of Chicago in reference to the closing, between certain hours of each day, of bridges across the Chicago River.   Those regulations were alleged to be inconsistent with the power of Congress over interstate commerce.   This court said : " The Chicago River and its branches must, therefore, be deemed navigable waters of the United States, over which Congress under its commercial power may exercise control to the extent necessary to protect, preserve, and improve their free navigation.   But the States have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience, and prosperity of their people.   This power embraces the construction of roads, canals, and bridges, and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority.   They are the first to see the importance of such means of internal communication, and are more deeply concerned than others in their wise management.   Illinois is more immediately affected by the bridges over the Chicago

River and its branches than any other State, and is more directly concerned for the prosperity of the city of Chicago, for the convenience and comfort of its inhabitants, and the growth of its commerce.   And nowhere could the power to control the bridges in that city, their construction, form, and strength, and the size of their draws, and the manner and times of using them, be better vested than with the State, or the authorities of the city upon whom it has devolved that duty.   When its power is exercised, so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction.   If the power of the State and that of the Federal Government come in conflict, the latter must control and the former yield.   This necessarily follows from the position given by the Constitution to legislation in pursuance of it, as the supreme law of the land.   But until Congress acts on the subject, the power of the State over bridges across its navigable streams is plenary.   This doctrine has been recognized from the earliest period, and approved in repeated cases, the most notable of which are *Willson* v. *The Blackbird Creek Marsh Co.*, 2 Pet. 245, decided in 1829, and *Gilman* v. *Philadelphia,* 3 Wall. 713, decided in 1865."

To the same effect is the recent decision in *Lake Shore & Michigan Railway* v. *Ohio*, 165 U. S. 365, 366, 368.   See also *Cardwell* v. *American Bridge Co.*, 113 U. S. 205, and *Huse* v. *Glover*, 119 U. S. 543.

Did Congress, in the execution of its power under the Constitution to regulate interstate commerce, intend by the legislation in question to supersede, for every purpose, the authority of Illinois over the erection of structures in navigable waters wholly within its limits ?   Did it intend to declare that the wishes of Illinois in respect of structures to be erected in such waters need not be regarded, and that the assent of the Secretary of War, proceeding under the above acts of Congress, was alone sufficient to authorize such structures ?

These questions were substantially answered by this court in *Lake Shore & Michigan Railway* v. *Ohio*, above cited, decided in 1896.  That case required a construction of the fifth and seventh sections of the River and Harbor Act of September 19,

1890, upon which sections the plaintiffs in this case partly rely. In that case this court said : " The contention is that the statute in question manifests the purpose of Congress to deprive the several States of all authority to control and regulate any and every structure over all navigable streams, although they be wholly situated within their territory. That full power resides in the States as to the erection of bridges and other works in navigable streams wholly within their jurisdiction, in the absence of the exercise by Congress of authority to the contrary, is conclusively determined. . . . The mere delegation to the Secretary of the right to determine whether a structure authorized by law has been so built as to impede commerce, and to direct, when reasonably necessary, its modification so as to remove such impediment, does not confer upon that officer power to give original authority to build bridges, nor does it presuppose that Congress conceived that it was lodging in the Secretary power to that end. . . . The mere delegation of power to direct a change in lawful structures so as to cause them not to interfere with commerce cannot be construed as conferring on the officer named the right to determine when and where a bridge may be built." Referring to the seventh section of the act of 1890, the court said : " The language of the seventh section makes clearer the error of the interpretation relied on. The provision that it shall not be lawful to thereafter erect any bridge ' in any navigable river or navigable waters of the United States, under any act of the legislative assembly of any State, until the location and plan of such bridge . . . have been submitted to and approved by the Secretary of War,' contemplated that the function of the Secretary should extend only to the form of future structures, since the act would not have provided for the future erection of bridges under state authority if its very purpose was to deny for the future all power in the States on the subject. . . . The construction claimed for the statute is that its purpose was to deprive the States of all power as to every stream, even those wholly within their borders, whilst the very words of the statute, saying that its terms should not be construed as conferring on the States power to give authority to build bridges on streams not wholly within their limits,

by a negative pregnant with an affirmative, demonstrate that the object of the act was not to deprive the several States of the authority to consent to the erection of bridges over navigable waters wholly within their territory."

The decision in *Lake Shore & Michigan Railway* v. *Ohio* was rendered before the passage of the River and Harbor Act of 1899. But the tenth section of that act, upon which the permit of the Secretary of War was based, is not so worded as to compel the conclusion that Congress intended, by that section, to ignore altogether the wishes of Illinois in respect of structures in navigable waters that are wholly within its limits. We may assume that Congress was not unaware of the decision of the above case in 1896 and of the interpretation placed upon existing legislative enactments. If it had intended by the act of 1899 to assert the power to take under national control, for every purpose, and to the fullest possible extent, the erection of structures in the navigable waters of the United States that were wholly within the limits of the respective States, and to supersede entirely the authority which the States, in the absence of any action by Congress, have in such matters, such a radical departure from the previous policy of the Government would have been manifested by clear and explicit language. In the absence of such language it should not be assumed that any such departure was intended.

We do not overlook the long-settled principle that the power of Congress to regulate commerce among the States "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution." *Gibbons* v. *Ogden*, 9 Wheat. 1, 196; *Brown* v. *Maryland*, 12 Wheat. 419, 446; *Brown* v. *Houston*, 114 U. S. 630. But we will not at this time make any declaration of opinion as to the full scope of this power or as to the extent to which Congress may go in the matter of the erection, or authorizing the erection, of docks and like structures in navigable waters that are entirely within the territorial limits of the several States. Whether Congress may, against or without the expressed will of a State, give affirmative authority to private parties to erect structures in such waters, it is not necessary in

.this case to decide. It is only necessary to say that the act of 1899 does not manifest the purpose of Congress to go to that extent under the power to regulate foreign and interstate commerce and thereby to supersede the original authority of the States. The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a State, depend upon the concurrent or joint assent of both the National Government and the state government. The Secretary of War, acting under the authority conferred by Congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the State acting by its constituted agencies.

For the reasons stated, the judgment of the Circuit Court is
*Affirmed.*